STATE OF MAINE                                    SUPERIOR COURT
CUMBERLAND, ss.                                   CIVIL ACTION
                                                  DOCKET NO: CV-09-689
                                                  RFC- Cum- 9/28/2010

MICHAEL J. HASKELL,
JOSEPH M. BROWN, and
SEBAGO GRAVEL PIT, LLC

                 Plaintiffs,
                                                  **ORDER ON DEFENDANTS'**
        v.                                        **PARTIAL MOTION TO DISMISS**

ANN E. HASTINGS and
THE ANN E. HASTINGS LAW
OFFICE, P.A.

                                                  STATE OF MAINE
                 Defendants                       Cumberland, ss, Clerk's Office

                                                  SEP 28 2010

                                                  RECEIVED

Plaintiffs Michael J. Haskell, Joseph M. Brown, and Sebago Gravel Pit,

LLC filed this action against defendants Ann E. Hastings and the Ann E.

Hastings Law Office, P.A., to recover for professional negligence, breaches of

fiduciary duty, and negligent infliction of emotional distress. The defendants

argue that the six-year statute of limitations bars all claims arising from acts or

omissions occurring prior to December 30, 2003.

## BACKGROUND

Plaintiffs Michael J. Haskell, Joseph M. Brown, and Sebago Gravel Pit,

LLC own property on the western shore of Lake Sebago. (Pl.'s Compl. ¶¶ 1–4.)

They had operated the land as a gravel pit, but the land is now unproductive

because the plaintiffs have no legal way to access the property from the public

road due to the alleged negligence of defendants Ann E. Hastings and the Ann E.

Hastings Law Office, P.A. (Pl.'s Compl. ¶ 1.) A gap of 48.41 feet currently lies

between the plaintiffs' property and Route 114, occupied by a pond and the

1

submerged land of Arthur C. and Emma L. Shute. (Pl.'s Compl. ¶ 60.) The Shutes also hold flowage mill rights to the high-water mark of the pond and the Northwest River that feeds it. (Pl.'s Compl. ¶ 59.)

In 1960 Harold and Muriel Butler, the plaintiffs' predecessors in interest, owned the plaintiffs' land. (Pl.'s Compl. ¶ 12.) The Butlers were bounded on the north by the property of Byron Pride, and to the west by the property of Lewis Lumber Co. (Pl.'s Compl. ¶¶ 10, 12.) In 1960 the Shutes purchased Lewis Lumber Co.'s land together with certain pond lots, mill buildings, a mill dam, mill privileges, and all rights to the pond and the Northwest River. (Pl.'s Compl. ¶¶ 10–11.) In 1968, Arthur and Anita Crowe purchased the land of Byron Pride, excepting a twelve-foot right-of-way in favor of the Butlers to be held by them "appurtenant to their said land." (Pl.'s Compl. ¶ 12.)

In that same year, 1968, the State of Maine took over 4.4 acres of the Shutes' land to construct the current Route 114. (Pl.'s Compl. ¶ 13.) The taking diagonally bisected the Shutes' land from the southwest to the northeast, and was depicted on a map recorded in the Cumberland County Registry of Deeds. (Pl.'s Compl. ¶ 13.) In 1969 the Legislature passed a resolution granting the Shutes flowage rights adjacent to their mill privilege, recognizing that the Shutes intended to reconstruct an old dam and flood their land to the elevation of 299 feet, and granting them flowage privileges over part of the highway right-of-way to facilitate their goal. (Pl.'s Compl. ¶ 14.) After the taking and resolution, the Shutes owned land and flowage rights between the Route 114 right-of-way and the property of Harold and Muriel Butler. (Pl.'s Compl. ¶ 15.)

The plaintiffs purchased the Butlers' land in June of 1998. (Pl.'s Compl. ¶ 17.) Defendant Hastings, who had begun handling the plaintiffs' legal work in

2

the early 1990s, represented the plaintiffs in this purchase and performed the necessary title work. (Pl.'s Compl. ¶¶ 16–17.) The plaintiffs began to operate a gravel pit on the property, using an entry road that passed over Mr. Crowe's property to access Route 114. (Pl.'s Compl. ¶ 18.) Mr. Crowe quickly contacted Ms. Hastings to accuse the plaintiffs of trespassing and provide notice of a boundary dispute. (Pl.'s Compl. ¶ 19.)

In October 1999 Mr. Crowe's attorney informed Ms. Hastings that the plaintiffs did not have a deeded right-of-way. (Pl.'s Compl. ¶ 20.) On November 9, 1999, Ms. Hastings responded with a letter asserting that a right-of-way had been reserved and that even without a deed the plaintiffs had established a right-of-way by "usage." (Pl.'s Compl. ¶¶ 21A–B.) She proposed a twelve-month standstill agreement so that she and the plaintiffs could explore alternative means of accessing the property. (Pl.'s Compl. ¶ 21B.) She also referred to the Maine Highway Commission's map of its takings, recorded in 1968, which depicts a right-of-way in the plaintiffs over Mr. Crowe's land. (Pl.'s Compl. ¶ 21C.) The map also depicts the Shutes' interest in the area around Route 114.[1] (Pl.'s Compl. ¶ 21C.)

In 1999 Mr. Crowe filed suit against the plaintiffs, whom Ms. Hastings continued to represent. (Pl.'s Compl. ¶¶ 22–23.) Surveys performed during the course of discovery indicated that the precise boundaries of the plaintiffs' property were impossible to define accurately, but also noted the Shutes' mill privilege encumbering the banks of the pond and river. (Pl.'s Compl. ¶ 31, Ex. K at 7–8, 11, 13, 17.) The parties ultimately reached a settlement whereby Mr.

---

[1] The plaintiffs have not included an intact copy of the entire map, making it impossible to evaluate their assertion that the map made the ownership interests "clear."

3

Crowe would give the plaintiffs a triangular piece of land that would extend their holdings to the northwest in exchange for a similar piece of land to the southeast. (Pl.'s Compl. ¶¶ 33–34.) The plaintiffs understood that this exchange would give them the opportunity to connect their lot to Route 114 by constructing an alternative access road across the pond. (Pl.'s Compl. ¶ 33.)

On November 22, 2000, Ms. Hastings read the settlement agreement to a court reporter, whereby the plaintiffs would continue to use the existing access for three and one-half years, at which time they would release their claims to that access and begin using an alternative route. (Pl.'s Compl. ¶ 34.) On December 15, 2000, the Superior Court entered an order by agreement, allegedly prompting Ms. Hastings to tell her clients that "she had gotten them access to Route 114" and "'it's now all on you guys' to get regulatory approval." (Pl.'s Compl. ¶ 34A.)

She continued to work on executing the settlement, and the parties exchanged documents and dismissed the lawsuit on September 6, 2001. (Pl.'s Compl. ¶ 38.) These documents included a licensing agreement recorded on September 5, 2001, giving the plaintiffs access over Mr. Crowe's road until the earlier of May 17, 2004 or the establishment of an alternative access route. (Pl.'s Compl. ¶ 39.) The plaintiffs allege that Ms. Hastings specifically advised them that they would have "all right title and interest in the property to access Route 114 over the flood plain known as Mill Pond" and led them to believe "that they would have title to the land under Mill Pond." (Pl.'s Compl. ¶ 40.)

Ms. Hastings continued to represent the plaintiffs in other matters following the settlement with Mr. Crowe. (Pl's Compl. ¶ 43.) In 2003 the plaintiffs began to proceed with the planning and engineering of the new access they intended to construct across the pond to Route 114. (Pl.'s Compl. ¶ 44.) Ms.

4

Hastings began to perform legal work related to the road in 2004, and by March 2004 the plaintiffs had received the required permits from the Maine Department of Transportation and the Department of Environmental Protection. (Pl.'s Compl. ¶¶ 45–46.) The plaintiffs continued to expend funds on planning and permitting until September 20, 2004, when the Shutes wrote to the Department of Environmental Protection to object to the road and assert their mill privilege and flowage rights. (Pl.'s Compl. ¶¶ 49–51.)

The plaintiffs brought an action against the Shutes in October 2004, having no recourse against Mr. Crowe following the earlier settlement.[2] (Pl.'s Compl. ¶¶ 52, 60.) Ms. Hastings continued to work on the access issue as well as other legal matters through 2005 and into 2006. (Pl.'s Compl. ¶¶ 65–66.) She was unable to resolve the issue of access, however, and the Sebago Planning Board indicated that the plaintiffs lacked standing to apply for site plan review of the proposed access road because they had no authority to build across the pond. (Pl.'s Compl. ¶¶ 60–64.)

In May 2006 Ms. Hastings suggested that the plaintiffs employ another attorney to represent them in matters related to the landlocked property. (Pl.'s Compl. ¶¶ 68–69.) She introduced the plaintiffs to Attorney James Levis and began to consult with him on ways to challenge Mr. Crowe or the Shutes. (Pl.'s Compl. ¶¶ 67–72.) This collaboration continued until approximately September 28, 2006, around which time plaintiff Brown expressed his displeasure with Ms. Hastings's representation and apparently terminated their relationship. (Pl.'s Compl. ¶ 72.) Ms. Hastings never informed the plaintiffs that they might have a claim against her for malpractice. (Pl.'s Compl. ¶ 88.)

---

[2] The action against the Shutes appears unresolved. (*See* Pl.'s Compl. ¶ 70.)

On December 31, 2009, the plaintiffs filed their complaint against Ms. Hastings and her law office alleging professional negligence, breaches of fiduciary duty, and negligent infliction of emotional distress arising from her work on the Sebago property and the 2001 settlement with Mr. Crowe. The defendants answered on February 18, 2010, and filed this partial motion to dismiss on April 20, 2010.[3] Ms. Hastings contends that any of the plaintiffs' claims based on acts or omissions prior to December 30, 2003, are barred by the six-year statute of limitations applicable to legal malpractice.[4] 14 M.R.S. §§ 752, 753-B (2009). This would include all claims arising from the litigation with Mr. Crowe and the negotiation of the 2001 settlement agreement.

## DISCUSSION

On a motion to dismiss, the court examines "the complaint in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Heber v. Lucerne-in-Maine Village Corp.*, 2000 ME 137, ¶ 7, 755 A.2d 1064, 1066 (quoting *McAfee v. Cole*, 637 A.2d 463, 465 (Me. 1994)). Maine imposes a six-year statute of limitations on actions for legal malpractice. 14 M.R.S. § 752. In 1986 the Legislature clarified that the limitations period "starts to run from the date of the act or omission giving rise to the injury, not from the discovery of the malpractice, negligence or breach of contract, except as provided

---

[3] Extraneous documents included with the motion to dismiss have not been considered.

[4] While both parties vaguely acknowledge that actionable acts of malpractice may have occurred after December 30, 2003, the specific allegations of negligence go to the negotiation of the 2001 settlement with Mr. Crowe. The lack of discreetly-identified acts or omissions effectively transforms this motion to dismiss into a motion for declaratory judgment.

in this section or as the statute of limitations may be suspended by other laws."[5] L.D. 2400, § 2 (112th Legis. 1986) (codified at 14 M.R.S. § 753-B). Exceptions were made for actions arising from the "rendering of a real estate title opinion" or from "the drafting of a last will and testament that has been offered for probate"; the statute of limitations begins to run upon discovery of the negligence for these actions only. 14 M.R.S. § 753-B.

The plaintiffs offer a number of arguments as to why the statute of limitations should not bar their claims that arise from acts or omissions predating December 30, 2003. Two of these arguments are based on novel interpretations of the statutory text. First, the plaintiffs argue that their cause of action did not accrue until they were injured by the Shutes assertion of right against them in September 2004. Generally, a tort cause of action accrues when "a wrongful act produces an injury for which a potential plaintiff is entitled to seek judicial vindication." *Bozzutto v. Ouellette*, 408 A.2d 697, 699 (Me. 1979) (quoting *Williams v. Ford Motor Co.*, 342 A.2d 712, 714 (Me. 1975)) (quotations omitted). However, in the realm of legal malpractice 14 M.R.S. § 753-B "provides that the statute of limitations begins to run 'from the date of the act or omission giving rise to the injury,' except in specifically enumerated instances . . . ." *White v. McTeague, Higbee, Case, Cohen, Whitney & Toker, P.A.*, 2002 ME 160, ¶ 7, 809 A.2d 622, 623 (quoting section 753-B). The negligence triggers the statute rather than the eventual injury.

In *White*, the defendant had represented the plaintiff in a workers' compensation issue between December 1986 and January 1987. *Id.* ¶ 2, 809 A.2d

_____

[5] This amendment to the statute of limitations for legal malpractice was enacted as part of the same Bill that eliminated the discovery rule in actions for medical malpractice.

at 623. The defendant failed to inform the plaintiff of a ten-year statute of limitations on workers' compensation claims, and by 1998 the plaintiff was precluded from making additional claims on his original injury. *Id.* ¶ 3, 809 A.2d at 623. When the plaintiff attempted to claim workers' compensation for a 2001 knee-replacement surgery, the claim was denied as untimely. *Id.* ¶ 4, 809 A.2d at 623. The Law Court affirmed the trial court's determination that the "act or omission giving rise to the injury" occurred in 1986–1987, and not in 1998 when the plaintiff lost his ability to claim benefits. *Id.* ¶ 9, 809 A.2d at 624. The Court noted that the statute was clear and it had "no authority to depart from [the] policy of repose mandated by the Legislature." *Id.* ¶ 8, 809 A.2d at 624. From *White,* it is clear that courts should examine an attorney's individual acts or omissions when applying the statute of limitations, rather than the eventual harms that might arise. *Id.; see Nevin v. Union Trust Co.,* 1999 ME 47, ¶ 33, 726 A.2d 694, 700 (statute of limitations must be narrowly construed, and drafting of will was separate from ongoing negligent management of testamentary corporation).

The plaintiffs in this case claim that Ms. Hastings' negligent representation injured them by depriving them of access to their land or future legal avenues to obtain that access. While unspecified negligent acts may have occurred throughout the period of 1998 to 2006, the plaintiffs' injury appears to arise primarily from the 2001 settlement agreement with Mr. Crowe in which they agreed to relinquish their claims to a right-of-way over his property in exchange for a parcel of land that they mistakenly believed would provide them with access to Route 114. Assuming that some of Ms. Hastings' actions leading up to the settlement were negligent, delaying the accrual of a cause of action

until the parties became aware of the error in 2004 would effectively revive the discovery rule in clear violation of 14 M.R.S. § 753-B.

Finding no shelter in the definition of accrual, the plaintiffs suggest that the discovery rule should apply in this case, and that the limitations period should be extended to twenty years because Ms. Hastings's alleged negligence in procuring access to Route 114 was similar to "negligence in the rendering of a real estate title opinion . . . ." 14 M.R.S. § 753-B(2). This argument is unavailing. The term "real estate title opinion" as used in section 753-B(2) "refers to a written opinion of the status of title of a particular parcel of real estate based on an examination of that title." *Dowling v. Salewski*, 2007 ME 78, ¶ 17, 926 A.2d 193, 197. The plaintiffs have not alleged any claims arising from a faulty title opinion. While they may argue that Ms. Hastings was negligent in not examining the title to the land between the plaintiffs' property and Route 114, this does not bring their claim under the purview of section 753-B.

In addition to their arguments based on the statutory text, the plaintiffs offer four equitable arguments for why the statute of limitations should not bar their recovery for negligent actions occurring prior to December 30, 2003. The plaintiffs first argue that their fiduciary relationship with Ms. Hastings should estop her from asserting the statute. They cite the First Circuit case of *Bornstein v. Poulos*, 793 F.2d 444 (1st Cir. 1986) for support. *Bornstein* involved a suspect transaction between a creditor, a corporation, and the corporation's two controlling shareholders who were also its sole officers and directors. *Id.* at 445. Between 1974 and 1977 the creditor, corporation, and its two shareholders employed the defendant attorney to execute a two-part transaction in which the creditor would foreclose mortgages he held on the corporation's property, and

then convey the property to the shareholders in their personal capacities in exchange for a new mortgage. *Id.* The corporation declared bankruptcy in 1978. *Id.*

In 1983 the creditor filed a diversity action in Maine in an attempt to quiet title to the properties in his name. *Id.* at 446. The bankruptcy trustee brought counterclaims against everyone involved, including claims against the defendant attorney for malpractice. *Id.* The attorney asserted the statute of limitations. *Id.* The court found that the tolling rule from *Livermore Falls Trust & Banking Co. v. Riley*, 108 Me. 17, 78 A. 980 (1911), estopped the attorney from asserting the defense. *Bornstein*, 793 F.2d at 448. In *Livermore*, a corporate officer failed to repay a promissory note he owed the corporation. *Livermore*, 108 Me. at 22, 78 A. at 982. Maine's Law Court held that the statute of limitations did not begin to run until the defendant officer formally notified the Board of Directors that his note was overdue, as required by his fiduciary duty to the corporation. *Id.* at 24–25, 78 A. at 982–83. The officer's failure to inform his corporation of the debt was a breach of his fiduciary duty equivalent to fraudulent concealment. *Id.*

The *Bornstein* court reasoned that the rationale of *Livermore* regarding corporate officers and directors applied equally to an attorney in a fiduciary relationship to a corporation. *Bornstein*, 793 F.2d at 448. The attorney had "violated a separate fiduciary duty to the corporation, namely, his duty to protect it interests in respect to the foreclosures involved, and did so at a time when the corporation was unable to protect its own interests." *Id.* Maine's Superior Court recently referred the this as "the equitable doctrine of 'adverse domination,' where a 'cause of action will be tolled during the period that a plaintiff corporation is controlled by wrongdoers.'" *Murphy v. Van Meer &*

*Belanger, P.A.*, 1996 Me. Super. LEXIS 356 (Nov. 1, 1996) (quoting *Resolution Trust Corp. v. Gardner*, 798 F. Supp. 790, 795 (D.D.C. 1992)) (discussing *Bornstein*).

The *Bornstein* court also found support in *Anderson v. Neal*, 428 A.2d 1189 (Me. 1981). In *Anderson* the Law Court determined that it would be wholly inequitable to allow the statute of limitations to run on a claim arising from a negligently performed title search. *Id.* at 1192. The Court considered that "[t]he essence of the attorney-client relationship in title cases is the faith and trust which the client places in the representations of the attorney . . . ." *Id.* The degree of "reliance placed upon the attorney by the client and the lack of means for discovery place the client in a situation akin to that of one who has a cause of action fraudulently concealed from him." *Id.* The Court held that "[u]nder such circumstances, fairness, justice and common sense dictate . . . that a cause of action for negligent search of a title by an attorney does not accrue until the plaintiff discovers, or reasonably should have discovered, the injury." *Id.* The First Circuit drew from *Anderson* the idea that under some circumstances an attorney's breach of fiduciary duty could be so significant "that the statute of limitations should be tolled against him until the client is able to protect his own interests." *Bornstein*, 793 F.2d at 449.

Notably, however, the *Bornstein* court did *not* make any reference to 14 M.R.S. § 753-B, enacted a year earlier by the Legislature in 1985. Most of the arguments the *Anderson* Court articulated in favor of applying the so-called discovery rule to actions arising from a title opinion apply with equal strength to many or most actions for legal malpractice. Attorneys and their clients "necessarily share a fiduciary relationship of the highest confidence." *Anderson*, 428 A.2d at 1191. Clients must be able to trust their lawyers and prudent people

11

generally do not "hire a second attorney to check the work of the first," placing clients at the mercy of the legal experts they hire. *See id.* at 1192. Despite these considerations, in the wake of *Anderson* the Legislature determined that the discovery rule should not apply to actions for legal malpractice. Narrow exceptions were carved out for actions arising from the preparation of wills and title opinions, but the general rule of 14 M.R.S. § 753-B is that the statute of limitations for legal malpractice begins to run at the moment a negligent act takes place, regardless of when the actual injury occurs or whether the client could reasonably discover the error. *See White*, 2002 ME 160, ¶¶ 7–8, 809 A.2d at 623–24 (affirming that statutes of limitation are strictly construed and that "[t]he courts have no authority to depart from [the] policy of repose mandated by the Legislature"); *see also Dasha v. Maine Med. Ctr.*, 665 A.2d 993, 996 (Me. 1995) ("While the statutory scheme may be deemed unfair or harsh, we decline to circumvent it when the Legislature has explicitly decided the issue . . . .").

The plaintiffs cite to *Bornstein* and *Anderson* to assert that Ms. Hastings is estopped from asserting the statute of limitations, without precisely explaining how the cases apply. They have not alleged any facts indicating that Ms. Hastings actually concealed their potential cause of action against her, nor have they alleged that they were unable to protect their own interests due to adverse domination. Insofar as they shared a fiduciary relationship with Ms. Hastings, this alone cannot prevent the statute's application. The plaintiffs appear to be arguing that any breach of a fiduciary duty should toll the statute of limitations until the innocent party is able to discover the breach. The obvious problem with this argument is that every attorney is a fiduciary of her client, and every instance of malpractice is a potential breach. In effect the plaintiffs would apply

12

the discovery rule to every case of legal malpractice under the guise of equitable estoppel through a fiduciary relationship. This would gut 14 M.R.S. § 753-B and directly contradict the Legislature's directive. Whatever *Bornstein*'s current status in Maine may be, it does not save the plaintiffs from the statute of limitations in this case.

The plaintiffs also ask that the court allow them to proceed under the "continuous representation" doctrine. The doctrine would toll "the running of the statute in an attorney malpractice action until the professional relationship terminate[d] with respect to the matter underlying the malpractice action." *Nevin*, 1999 ME 47, ¶ 36, 726 A.2d at 700 (quoting *Smith v. Stacy*, 198 W. Va. 498, 482 S.E.2d 115, 120 (W. Va. 1996)) (quotations omitted). The Law Court referenced but did not adopt this doctrine in *Nevin v. Union Trust.*

That case involved claims by a personal representative and various beneficiaries against the deceased's trust company and attorneys. In 1985 the deceased client worked with the defendant trust company to transfer her property into a corporation for estate planning purposes. *Id.* ¶ 7, 726 A.2d at 697. The defendant attorneys formed the corporation, drafted the necessary testamentary documents, and managed the corporation's legal affairs from 1985 to 1992 when the client died. *Id.* ¶¶ 7–13, 726 A.2d at 697. In 1988, at the attorneys' suggestion, the client transferred her corporate stock to an irrevocable trust in violation of the corporate articles. *Id.* ¶ 11, 726 A.2d at 697. In 1994 the Internal Revenue Service determined that corporate formalities had not been followed and consequently assessed additional taxes, interest, and penalties in excess of $400,000 against the estate. *Id.* ¶ 14, 726 A.2d at 697.

13

During the subsequent litigation, the trial court granted all of the defendants' partial summary judgment due to the statute of limitations. *Id.* ¶ 20, 726 A.2d at 698. The parties then stipulated that no claims arose after February 1, 1989, leaving only the application of the statute of limitations for appeal. *Id.* ¶ 3, 726 A.2d at 696. Addressing the claims against the attorneys, the Law Court found that the plaintiffs had not demonstrated any negligence in the drafting of the will, and held that 14 M.R.S. § 753-B[6] precluded the application of a discovery rule to toll the statute of limitations. *Id.* ¶¶ 33–34, 726 A.2d at 700. The statute had thus run and the claims against the attorneys were barred. *Id.* ¶ 38, 726 A.2d at 701.

In dicta, the Court went on to address the doctrine of continuing representation. The Court said that:

> For the doctrine to apply, there must be a "clear indicia of an ongoing, continuous, developing, and dependent relationship between the client and the attorney." *Schoenrock v. Tappe*, 419 N.W.2d 197, 201 (S.D. 1988) (quoting *Muller v. Sturman*, 79 A.D.2d 482, 437 N.Y.S.2d 205, 208 (N.Y. App. Div. 1981). Even if we might apply the continuing representation doctrine in the appropriate case, here plaintiffs have stipulated away any such claims by waiving claims regarding any representation in the period after February 1, 1989.

*Nevin*, 1999 ME 47, ¶ 37, 726 A.2d at 700–01. The Court thus left open the question of whether it would ultimately adopt the doctrine of continuing representation in Maine. The plaintiffs urge this court to apply the doctrine in this case. Were the court to do so, the plaintiffs note that it would be joining the ranks of many other states, including Massachusetts. *Lyons v. Nutt*, 436 Mass. 244, 249–50, 736 N.E.2d 1065, 1070 (Mass. 2002); *see Smith*, 198 W. Va. at 503–06,

---

[6] At the time, the current section 753-B was codified as 14 M.R.S. § 753-A. The Legislature recodified the law into its current configuration in 2001. L.D. 309, § 1 (120th Legis. 2001).

14

S.E.2d at 120–22 (discussing other states' adoption of the doctrine). However, a quick review of Massachusetts's law shows the danger of blindly following the lead of other jurisdictions. Massachusetts generally applies the discovery rule to all actions for legal malpractice, whereas Maine's Legislature has strictly limited the rule's application through section 753-B. *Compare Lyons*, 436 Mass. at 247, 736 N.E.2d at 1068–69 *to White*, 2002 ME 160, ¶ 7, 809 A.2d at 623–24.

A West Virginia case cited in *Nevin* is instructive on whether the doctrine is compatible with the current law of Maine. The Court quoted *Smith v. Stacey* to define the doctrine of continuing representation as one that "tolls the running of the statue in an attorney malpractice action until the professional relationship terminates with respect to the matter underlying the malpractice action." *Nevin*, 1999 ME 47, ¶ 36, 726 A.2d at 700 (quoting *Smith*, 198 W. Va. at 482 S.E.2d at 120). The court goes on to note that the doctrine "is an adaptation of the 'continuous treatment' rule applied in the medical malpractice forum . . . ." *Smith*, 198 W. Va. at 503, 482 S.E.2d at 120. Maine's Law Court has considered the continuous treatment rule at length and has definitively rejected it as being incompatible with the Legislature's instruction "that the cause of action 'accrues on the date of the act or omission giving rise to the injury . . . .'" *Dickey v. Vermette*, 2008 ME 179, ¶ 7, 960 A.2d 1178, 1180 (discussing the statute of limitations for medical malpractice, 24 M.R.S. § 2902).

The *Smith* court also noted that some states view the doctrine of continuous representation as "a 'branch of the discovery rule,' which holds that 'by virtue of the attorney-client relationship, there can be no effective discovery of the negligence so long as the relationship prevails.'" *Smith*, 198 W. Va. at 504,

482 S.E.2d at 121 (quoting *Alagia, Day, Trautwein & Smith v. Broadbent*, 882 S.W.2d 121, 125 (Ky. 1994)). The court quoted one treatise explaining that:

> Adoption of the rule was a direct reaction to the illogical requirement of the occurrence rule, which compels clients to sue their attorneys although the relationship continues and there has not been and may never be any injury. . . . The rule of continuous representation is available and appropriate in those jurisdictions adopting the damage and discovery rules.

*Smith*, 198 W. Va. at 505, 482 S.E.2d at 122 (quoting Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice § 21.12, at 822 (4th ed. 1996)).

Though it may be illogical, Maine's Legislature has unambiguously directed that the occurrence rule apply to legal malpractice and has taken the question "out of the arena of the judicial prerogative" by enacting 14 M.R.S. § 753-B. *Myrick v. James*, 444 A.2d 987, 992 (Me. 1982) (cited by *White*, 2002 ME 160, ¶ 8, 809 A.2d at 624.) "Unlike other contexts, the Legislature specifically enacted [section 753-B] to dictate the exclusive situations in which courts can apply the discovery rule in actions against attorneys." *White*, 2002 ME 160, ¶ 7, 809 A.2d at 623–24. Apart from actions arising from the drafting of a will or the rendering of a title opinion, the discovery rule does not apply and "the statute of limitations starts to run from the date of the act or omission giving rise to the injury . . . ." 14 M.R.S. § 753-B.

While application of the doctrine of continuous representation may or may not hinge on the time a client discovers the attorney's negligence, *see Smith*, 198 W. Va. at 505–06, 482 S.E.2d at 122–23, it stems from the same logic underpinning the discovery rule and has the same relevant effect: It prevents the statute of limitations from running on "the date of the act or omission giving rise to the injury." It thus represents "a judicially-created exception that is contrary to the plain meaning of" section 753-B. *Dickey*, 2008 ME 179, ¶ 7, 960 A.2d at 1180.

16

This court will not adopt and apply the doctrine in this case, as it runs contrary to Maine's statutory law and precedent.

The plaintiffs also argue that the court should apply general equitable tolling principles, of which the continuous representation doctrine is a specific application, to relieve them of the statute of limitations. Broadly stated, "[e]quitable tolling preserves a plaintiff's claim when strict application of the limitations period would be inequitable. (Pl.'s Resp. at 21 (citing *Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999)).) However, the Law Court has repeatedly stated that statutes of limitation are to be strictly construed. *White*, 2002 ME 160, ¶ 8, 809 A.2d at 624 (citing *Harkness v. Fitzgerald*, 1997 ME 207 ¶ 5, 701 A.2d 370, 372); *Nevin*, 1999 ME 47, ¶ 33, 726 A.2d at 700. The same reasons that weigh against adoption of the continuous representation doctrine discourage the adoption of even wider-ranging equitable tolling principles.

Finally, the plaintiffs contend that Ms. Hastings fraudulently concealed their cause of action, tolling the statute of limitations pursuant to 14 M.R.S. § 859.[7] A plaintiff invoking the statute "must establish 'that defendants actively concealed material facts from her and that she relied on their acts and statements to her detriment, or . . . that a special relationship existed between the parties that imposed a duty to disclose the cause of action, and the failure of defendants to honor that duty.'" *Brown v. Oral Surgery Assocs.*, 2003 ME 11, ¶ 21, 819 A.2d 1014, 1026 (quoting *Harkness v. Fitzgerald*, 1997 ME 207, ¶ 6, 701 A.2d 370, 372). On a Rule 12(b) motion to dismiss, facts must appear in the complaint sufficient to

---

[7] "If a person, liable to any action mentioned, fraudulently conceals the cause thereof from the person entitled thereto, . . . the action may be commenced at any time within 6 years after the person entitled thereto discovers that he has just cause of action . . . ." 14 M.R.S. § 859 (2009).

17

raise the issue of fraud.[8] *See Chiapetta v. Clark Assocs.*, 521 A.2d 697, 700 (Me. 1987).

> When a plaintiff contends a genuine issue of material fact concerning the defendant's fraudulent concealment has been generated, the court assess the facts against the elements of fraud: "(1) the making of a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of whether it is true or false; (4) for the purposes of inducing another to act upon it; and (5) justifiable and detrimental reliance by the other."

*Brown*, 2003 ME 11, ¶ 21, 819 A.2d at 1026 (quoting *Harkness*, 1997 ME 207, ¶ 7, 701 A.2d at 372). When the parties share a fiduciary relationship, "omission by silence may constitute the supplying of false information." *Id.* ¶ 22, 819 A.2d at 1026 (quoting *Glynn v. Atlantic Seaboard Co.*, 1999 ME 53, ¶ 12, 728 A.2d 117, 121) (quotations omitted). Fraud may be inferred if the defendant fiduciary knew particular facts but did "not disclose them causing the plaintiff to rely on those facts" to her detriment. *Id.*

The plaintiffs have not raised the issue of fraud in their complaint, nor have they attempted to show how the facts alleged in their complaint make out a case for fraudulent concealment. Instead, they assert that "[c]oncealment by a lawyer/fiduciary is alleged and must be accepted as true." (Pl.'s Resp. at 24.) None of their cited law supports this bold prospect. Turning to the plaintiffs' factual allegations, it appears that by 1999 Ms. Hastings should have known that the Shutes had an interest in the entirety of the pond, and that she was mistaken when she told the plaintiffs in the year 2000 that she had procured them access to Route 114. (Pl.'s Compl. ¶¶ 21C, 32, 34A.) She was similarly mistaken in 2001

---

[8] The Law Court has not directly addressed whether the heightened pleading requirements for fraud imposed by Rule 9(b) apply to claims of fraudulent concealment raised under 14 M.R.S. § 859. However, "[b]ecause a claim of fraudulent concealment necessarily includes allegations of fraud, it must be plead with particularity." *Taylor v. Phillip Morris, Inc.*, 2001 Me. Super. LEXIS 76 (May 29, 2001) (Cole, J.).

when she told them that they would have direct access to Route 114 across the pond, pending permitting, as a result of the settlement with Mr. Crowe. (Pl.'s Compl. ¶¶ 39–40.)

While these allegations do show negligence, they do not imply that Ms. Hastings knew that the plaintiffs would not be able to cross the pond and concealed this fact, or that she recklessly represented that the plaintiffs would be able to access the road without performing *any* inquiry into the truth or falsity of her statement. Furthermore, the plaintiffs allege that Ms. Hastings performed legal work to obtain all the required permits until the Shutes asserted their interest in 2004. (Pl.'s Compl. ¶¶ 43–51.) This undermines the plaintiffs' argument that Ms. Hastings knew they would not be able to access Route 114 and was working to conceal this fact. Even with all inferences drawn in the plaintiffs' favor, their complaint does not raise the issue of fraud or fraudulent concealment and they cannot use section 859 to shield their action from the statute of frauds.

The plaintiffs have not established that Ms. Hastings fraudulently concealed their cause of action or that their claims come under one of 14 M.R.S. § 753-B's exceptions allowing the discovery rule. Given the plain language of section 753-B and the Maine courts' history of strictly construing statutes of limitations, the plaintiffs may not invoke equitable doctrines to avoid the statute's operation. As this is a claim for professional negligence against an attorney, the six-year statute of limitations began to run at the time of the acts or omissions giving rise to the plaintiffs' injuries. They did not file their action until December 31, 2009, and are thus barred from bringing any claims arising from acts or omissions that occurred prior to December 30, 2003.

19

**The entry is:**

The defendants' partial motion to dismiss is granted. The plaintiffs may not maintain any claims arising from any of the defendants' acts or omissions that occurred prior to December 30, 2003.

DATE: September 28, 2010

Roland A. Cole
Justice, Superior Court

-------------------------------------------------------------------------------

01 0000002300            CAMPBELL, JOHN S
     75 MARKET STREET PO BOX 369 PORTLAND ME 04112-0369

| | | | | |
|---|---|---|---|---|
| F | MICHAEL J HASKELL | PL | RTND | 12/31/2009 |
| F | JOSEPH M BROWN | PL | RTND | 12/31/2009 |
| F | SEBAGO GRAVEL PITT LLC | PL | RTND | 12/31/2009 |

02 0000001252            FRIEDMAN, HAROLD
     SIX CITY CENTER PO BOX 4726 PORTLAND ME 04112-4726

| | | | | |
|---|---|---|---|---|
| F | ANNE E HASTINGS | DEF | RTND | 02/18/2010 |

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO: CV-09-689
RAC-CUM- 3/8/2012

MICHAEL J. HASKELL,

JOSEPH M. BROWN,

and

SEBAGO GRAVEL PIT, LLC,

Plaintiffs,

v.

ANN E. HASTINGS

and

ANN E. HASTINGS LAW OFFICE, P.A.,

Defendants.

**STATE OF MAINE**
**Cumberland,ss,Clerk's Office**

**MAR 0 8 2012**

ORDER **RECEIVED**

The Defendants' motion for summary judgment pursuant to Maine Rules of Civil Procedure 7 and 56 is before the court.

## BACKGROUND

### 1. Factual Background

In June 1998 plaintiffs Michael Haskell and Joseph Brown[1] purchased about 15 aches of land in Sebago, Maine, and used the property to operate a gravel pit ("the Property"). The Property abutted land owned by Arthur and Anita Crowe. A boundary dispute arose between the Plaintiffs and the Crowes and the Plaintiffs hired defendant Attorney Hastings to assist with resolving the dispute, she had also assisted with the acquisition of the Property.

---

[1] Haskell and Brown own Sebago Gravel Pit, LLC (collectively, "the Plaintiffs").

1

In November 2000 the Plaintiffs and the Crowes reached a settlement regarding the disputed land. According to the Plaintiffs, this settlement allowed the Plaintiffs to use a right of way connecting the Property to Route 114 for roughly three and half years while they constructed an alternative access road connecting the Property to Route 114. Additionally, the parties swapped roughly equal portions of their land.

The Plaintiffs viewed obtaining permanent access to Route 114 as the entire purpose of doing the settlement with the Crowes and believed Attorney Hastings also understood this purpose. The Plaintiffs allege that they gave up their existing right of way and dismissed their claim against the Crowes based on the advice given by Attorney Hastings and their belief that she had done the necessary research to give this advice. Attorney Hastings claims that she repeatedly denied telling the Plaintiffs that they would have access to Route 114 from their property.

Following the settlement with the Crowes, the Plaintiffs filed a number of applications and spent money attempting to build the access road. During this time a new problem arose regarding part of the property the Plaintiffs needed to cross in order to reach Route 114. This dispute surfaced when neighboring landowners, Arthur and Emma Shute, asserted their property interest over a crucial part of the property. The issue went before the Sebago Planning Board and the Board decided that the Shutes owned the disputed portion of the property. As a result, the Board found that the Plaintiffs did not have standing and dismissed the application without prejudice.

In October 2006 the Plaintiffs, represented by Attorney Levis, filed a suite against the Shutes claiming that the Shutes were not the proper owners of the disputed portion of land. The parties disagree regarding why this lawsuit ended, but the case was

2

dismissed without prejudice.[2] The Plaintiffs now claim that the land trade they did with the Crowes only took their property to Mill Pond and they need to obtain a right of way from the Shutes to traverse the pond and access Route 114. The Defendants claim that the Shutes might not have that property right and the Plaintiffs are probably able to access Route 114 without negotiating with the Shutes.

### 2. Parties' Arguments

On December 31, 2009, the Plaintiffs filed the complaint in this case claiming that Attorney Hastings committed professional negligence by giving them bad advice regarding their rights to an access road. They claim that she advised them to settle with the Crowes, giving up potentially valuable rights, in order to gain property that would allow them to build a road across the Mill Pond and access Route 114. They also claim that Attorney Hastings knew or should have known that even with the land they received from the Crowes they still cannot access Route 114 because the Shutes own all of Mill Pond and the property on the other side.[3]

In this motion for summary judgment, the Defendants argue that the Plaintiffs' claim is purely speculative because they cannot show that the Defendants' actions caused an injury or loss to the Plaintiffs. The Defendants base this argument on the fact that the Plaintiffs did not resolve the issue of ownership with the Shutes because they did not pursue the civil case against the Shutes and the case was dismissed without prejudice. Therefore, the Defendants claim that the Plaintiffs cannot demonstrate the necessary proximate cause to show professional negligence. Additionally, the

---

[2] The Defendants claims that the Plaintiffs stopped paying Levis so he withdrew his representation and the complaint was dismissed without prejudice because the Shutes were not served. The Plaintiffs claim they realized that the suit did not have a sufficient likelihood of success and Levis was not properly representing their interest so the complaint was dismissed.
[3] On September 28, 2010, this court granted a partial motion to dismiss ordering that the Plaintiffs may not maintain any claims arising from any of the Defendants' acts or omissions that occurred prior to December 30, 2003.

3

Defendants claim that if the Plaintiffs pursued their civil claim against the Shutes they would be successful and, therefore, be able to build the access road as indicated by Attorney Hastings. In response, the Plaintiffs argue that the Shutes do own the land and they can prove this ownership through this litigation.

## DISCUSSION

### 1. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *see also Levine v. R.B.K. Caly Corp.*, 2001 ME 77, ¶ 4, 770 A.2d 653. A motion for summary judgment must be supported by citations to record evidence of a quality that would be admissible at trial. *Levine*, 2001 ME 77, ¶ 6, 770 A.2d 653 (citing M.R. Civ. P. 56(e)). An issue of "material fact exists when there is sufficient evidence to require a fact-finder to choose between competing versions of the truth at trial." *Inkell v. Livingston*, 2005 ME 42, ¶ 4, 869 A.2d 745 (quoting *Lever v. Acadia Hosp. Corp.*, 2004 ME 35, ¶ 2, 845 A.2d 1178). Any ambiguities must be resolved in favor of the non-moving party. *Beaulieu v. The Aube Corp.*, 2002 ME 79, ¶ 2, 796 A.2d 683. (citing *Green v. Cessna Aircraft Co.*, 673 A.2d 216, 218 (Me. 1996)).

### 2. Professional Negligent

It is well established in Maine that "[t]o prove attorney malpractice, a plaintiff must show: (1) a breach by the defendant of the duty owed to the plaintiff to conform to a certain standard of conduct; and (2) that the breach of that duty proximately caused an injury or loss to the plaintiff." *Corey v. Norman, Hanson & DeTroy*, 1999 ME 196, ¶ 10, 742 A.2d 933. "[T]o prevail in a legal malpractice action, a plaintiff must demonstrate that he or she would have achieved a more favorable result but for the defendant's alleged legal malpractice." *Niehoff v. Shankman & Assoc. Legal Ctr, P.A.*, 2000 ME 214, ¶

4

9, 763 A.2d 121. The second element, proximate cause, is at issue in this motion. In order to show proximate cause the plaintiff must demonstrate "that the negligence played a substantial part in bringing about or actually causing the injury or damage and that the injury or damage was either a direct result or a reasonable foreseeable consequence of the negligence." *Id.* at ¶ 8 (quoting *Merriam v. Wanger*, 2000 ME 159, ¶ 8, 757 A.2d 778).

The Plaintiffs argue that but for Attorney Hastings' negligence they do not have an access road from the Property to Route 114, and therefore they cannot sufficiently use the Property. The Defendants claim that even with Attorney Hastings' alleged negligence the Plaintiffs could have build an access road if they had pursued their legal claim against the Shutes and thus the alleged negligence[4] is not the proximate cause of the alleged damages.

Based on the evidence before the court, neither party's claim is clearly supported. The Defendants looked to riparian law and claim that the Plaintiffs have rights to a sufficient portion of the disputed land to build an access road. Essentially, the Defendants argue that the Plaintiffs have property rights to the center of the Mill Pond, *see Mansur v. Blake*, 62 Me. 38, 41 (1873)[5], and they can build despite flowage rights, *see Waltham v. PPL Maine, LLC*, 2006 ME 88, ¶¶ 9–10, 901 A.2d 816 (allowing the owner of submerged land to "put the land to any use that is not detrimental to the lake" when another has flowage rights). Conversely, the Plaintiffs claim that the state provided the Shutes with rights to the whole body of water and, even if the Plaintiffs did have access

---

[4] The defendants do not address the duty of care or breach in this motion, but they do not admit to any element of negligence.

[5] "The owner of land touching the water of a stream, goes to the centre. *Herring v. Fisher*, 1 Sandf. 344. Where a lot of land is bounded by a pond artificially created by the flowing of a stream by a mill-dam, the same rule applies to the pond as to the stream before the dam was build. . . . A grant of land bounded by a pond artificially raised, is presumed to go to the centre of the stream. *Robinson v. White*, 42 Me. 209." *Mansur v. Blake*, 62 Me. 38, 41 (1873).

5

to the water, the Shutes own land between the water and the road. The Plaintiffs have an expert, Samuel Kilbourn a transactional residential real estate attorney, who appears to believe that the Plaintiffs cannot build an access road. (Pl.'s S.M.F. ¶¶ 86, 87 *denied, objected, and qualified by* Opp. Pl.'s S.M.F. ¶¶ 86, 87.) There is not sufficient information before the court to determine which party is correct as a matter of law. Therefore, the court is unable to grant summary judgment.

**The entry is:**

The Motion for Summary Judgment is DENIED.

DATE: _March 8, 2012_

_____
Roland A. Cole
Justice, Superior Court

STATE OF MAINE
Cumberland, ss, Clerk's Office

MAR 08 2012

RECEIVED

6

RK OF COURTS
berland County
ry Street, Ground Floor
land, ME 04101

Jonathan Dunitz Esq   DM
P O Box 4726
Portland Me 04112

K OF COURTS
berland County
y Street, Ground Floor
and, ME 04101

John Campbell Es   P\
58 Baxter Blvd
Portland Me 0114